UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

KAREEM HASSAN, individually and on
behalf of all others similarly situated,

                         Plaintiff,

         -against-

FORDHAM UNIVERSITY,

                   Defendant.

--------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __1/28/21_____
```

20-CV-3265 (KMW)

**OPINION & ORDER**

KIMBA M. WOOD, United States District Judge:

      Plaintiff Kareem Hassan has filed a First Amended Class Action Complaint (the "Complaint") against Defendant Fordham University ("Fordham"), seeking a refund of tuition and all fees in connection with the university's suspension of in-person instruction in light of the COVID-19 pandemic.   Plaintiff requests relief based on four grounds:   breach of contract, unjust enrichment, conversion, and money had and received.   Fordham has moved to dismiss the Complaint.   For the reasons set forth below, Fordham's motion is GRANTED.

## BACKGROUND

      Plaintiff is an undergraduate student at Fordham.   (Compl. ¶ 18, ECF No. 12.) Fordham's Spring 2020 semester began on January 13.   (*Id.* ¶ 10.)   On March 9, the COVID-19 pandemic caused Fordham to suspend in-person instruction and to begin holding classes "in an online format, with no in-person instruction."   (*Id.* ¶ 12.)   Students were asked to leave Fordham's campuses no later than March 22.   (*Id.* ¶ 34.)   Remote instruction continued through the end of the semester on May 12.   (*Id.* ¶¶ 10, 35.)   Simply put, Fordham did not provide in-person education for approximately half of the Spring 2020 semester.   (*Id.* ¶ 14.)

      According to Plaintiff, Fordham's remote-learning opportunities were "subpar in

practically every aspect, from the lack of facilities, materials, and access to faculty."   (*Id.* ¶ 13.)
Remote learning was "in no way the equivalent of the in-person education that Plaintiff and the
putative class members contracted and paid for," and educational opportunities offered to
Fordham students were "a shadow of what they once were."   (*Id.* ¶¶ 13, 39.)   Nonetheless,
Fordham has not issued tuition refunds for any portion of the Spring 2020 semester.   (*Id.* ¶ 15.)
Fordham has reduced some but not all non-tuition fees.   (*See id.* ¶ 16.)

Plaintiff thus brings this action on behalf of "all people who paid tuition and other fees for
the Spring 2020 academic semester at Fordham" and "lost the benefit of the education for which
they paid."   (*Id.* ¶¶ 1, 42.)   Plaintiff seeks also to represent a subclass consisting of class
members who reside in New Jersey.   (*Id.* ¶ 43.)   Plaintiff claims that the class is "entitled to a
refund of tuition for in-person educational services, facilities, access, and/or opportunities that
[Fordham] has not provided," as well as a refund of "all fees."   (*Id.* ¶ 16.)   More specifically,
Plaintiff seeks "disgorgement of the pro-rated portion of tuition and fees" for the period from
March 9 to May 12.   (*See id.* ¶¶ 17, 41.)

Plaintiff filed a complaint on April 25, 2020 and a First Amended Complaint on August 5,
2020.   (ECF Nos. 1, 12.)   On September 4, Fordham moved to dismiss the Amended
Complaint.   (ECF No. 15.)   On October 5, Plaintiff filed an opposition to Fordham's motion.
(ECF No. 21.)   On October 19, Fordham filed its reply memorandum.   (ECF No. 26.)   Since
the filing of the reply, both parties have filed notices of supplemental authority, bringing to the
Court's attention recent decisions in other tuition-related lawsuits.   (ECF Nos. 27, 29, 31, 32.)
Fordham has filed objections to each of Plaintiff's notices.   (ECF Nos. 28, 30, 33.)

## LEGAL STANDARDS

A complaint must be dismissed if it fails to state a claim upon which relief can be granted.
Fed. R. Civ. P. 12(b)(6).   To survive a motion to dismiss under Rule 12(b)(6), the complaint

must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   A court must accept "all factual allegations as true," but gives "no effect to legal conclusions couched as factual allegations." *See Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017) (quoting *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010)).

When adjudicating a motion to dismiss, district courts "may review only a narrow universe of materials." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).   Courts generally do not "look beyond facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken." *Id.* (quoting *Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016)) (alterations and internal quotation marks omitted)

## DISCUSSION

## I.   **Whether Plaintiff's Claims Are Barred**

As an initial matter, the Court must decide whether Plaintiff's claims are barred by New York law and public policy regarding "educational malpractice" and the proper role of courts in cases involving educational institutions.   At least one federal court in New York has allowed claims for tuition refunds in connection with suspensions prompted by the COVID-19 pandemic to proceed.   *See Ford v. Rensselaer Polytechnic Inst.*, 2020 WL 7389155, at *5-6 (N.D.N.Y. Dec. 16, 2020) (holding that plaintiff's claims "seeking recompense from their tuition payments" were not barred); *see also Bergeron v. Rochester Inst. of Tech.*, 2020 WL 7486682, at *2 (W.D.N.Y. Dec. 18, 2020) (allowing similar claims to proceed but not addressing the educational malpractice doctrine).   As explained below, the Court holds that New York law does not bar

Plaintiff's claims in their entirety at this stage.

### A.   The Educational Malpractice Doctrine

When applying traditional legal principles and rules to disputes within the academic community, courts in New York exercise the "utmost restraint."   *Olsson v. Bd. of Higher Ed*., 49 N.Y.2d 408, 413 (1980); *see Maas v. Cornell Univ.*, 94 N.Y.2d 87, 92 (1999) (stating that courts play a "restricted role" in controversies involving universities); *see also Papelino v. Albany Coll. of Pharm. of Union Univ.*, 633 F.3d 81, 94 (2d Cir. 2011) (stating that courts must show restraint when "intervening in controversies involving a student's academic qualifications"). Judicial restraint in the academic arena reflects the public policy that educational professionals are "peculiarly capable" of making decisions that are "appropriate and necessary" for educational institutions to function.    *Gertler v. Goodgold*, 107 A.D.2d 481, 485-86 (1st Dep't 1985), *aff'd*, 66 N.Y.2d 946 (1985).   Courts have thus "refused to substitute their judgment for that of university officials or to review the day-to-day administration of academic policies."   *Sirohi v. Lee*, 222 A.D.2d 222, 634 N.Y.S.2d 119 (1995); *see also Torres v. Little Flower Children's Servs.,* 64 N.Y.2d 119, 126 (N.Y. 1984) (stating that courts should avoid being "thrust into the position of reviewing the wisdom of educators' choices and evaluations").

This public policy does not mean that students may never sue universities for breach of contract.   *Ansari v. New York Univ.*, 1997 WL 257473, at *3 (S.D.N.Y. May 16, 1997) (Mukasey, J.).   If a contract with a university provides for "certain specified services," such as a "designated number of hours of instruction," and the university fails to satisfy that obligation, "a contract action with appropriate consequential damages might be viable."   *Id.* (quoting *Paladino v. Adelphi Univ.*, 89 A.D.2d 85, 92 (2d Dep't 1982)).

New York's public policy does, however, preclude lawsuits that are predicated on claims of "educational malpractice."   If the "essence of the complaint is that the school breached its

agreement to provide an effective education," or if a court is asked to "evaluate the course of instruction" or "review the soundness of the method of teaching that has been adopted by an educational institution," those claims should be dismissed.   *Ansari*, 1997 WL 257473, at *3 (citing *Paladino*, 89 A.D.2d at 89-90).

### B.   Nature of the Allegations in the Complaint

Fordham argues that the Complaint runs afoul of the educational malpractice doctrine because it "is premised on the notion that Plaintiff should be refunded money because the 'online learning options' ... were 'subpar.'"   (Mem. at 8, ECF No. 18; Reply at 12.)   Fordham asserts that the Complaint improperly urges the Court to "substitute [its] judgment for that of university officials" in deciding whether the methods and techniques of remote education were indeed "subpar."   (Mem. at 9.)   In response, Plaintiff insists that the Court need not "evaluate the course of instruction" or analyze "uniquely professional academic decisions."   (Opp'n at 5.)   Rather, according to Plaintiff, the Court is required to evaluate only whether Fordham "promised to provide services and failed to do so."   (*Id.* (quoting *Ansari*, 1997 WL 257473, at *3).)

The Court holds that Plaintiff's claims are not barred by the educational malpractice doctrine, because they are sufficiently grounded in whether an alleged promise for educational services was made and breached.   The Complaint focuses on statements in documents issued by Fordham to its students, such as the university's course catalog, that form the contractual relationship between the university and the student body.   (*E.g.*, Compl. ¶¶ 5-9.)   The Complaint alleges that Fordham made a promise in these documents to provide in-person educational services.   (*Id.* ¶ 59.)   A court attempting to ascertain whether the content of these documents constitutes such a specific promise would engage in an act of interpretation that does not involve questioning the judgments of educational professionals.   *Ansari*, 1997 WL 257473, at *3; *see Deen v. New Sch. Univ.*, 2007 WL 1032295, at *2 (S.D.N.Y. Mar. 27, 2007) (Wood, J.)

5

("The interpretation of a university's catalogue, like the interpretation of any contract, is a matter of law for the Court.").

One aspect of the Complaint, however, raises very serious concerns in light of the educational malpractice doctrine.   Plaintiff alleges that Fordham's remote instruction and educational opportunities were "subpar in practically every aspect," "in no way the equivalent of [an] in-person education," "a shadow of what they once were," and "not even remotely worth the amount charged class members for Spring Semester 2020 tuition."   (Compl. ¶¶ 13, 39, 40.) Fordham argues that the Court cannot assess this contention "without evaluating and measuring the alleged quality of educational services provided remotely as compared against in-person/on campus educational services."   (Reply at 12.)

Because these allegations primarily would impact the damages element of Plaintiff's contract claim, the Court is not persuaded that they form the "essence" of the Complaint, such that Plaintiff's claims should be barred entirely at this stage.   *Paladino*, 89 A.D.2d at 89, 92. *But see Lindner v. Occidental Coll.*, 2020 WL 7350212, at *6 (C.D. Cal. Dec. 11, 2020) (stating that courts "across the country have repeatedly rejected claims that seek damages for an allegedly 'subpar' education").   It is clear, however, that the Court may not evaluate and measure the quality of instruction.   To the extent that adjudicating Plaintiff's claims entails evaluation of whether a course conducted remotely was less valuable than one conducted in person—and if so, by how much—the Court should decline to "enter the classroom and determine whether or not the judgments and conduct of professional educators were deficient."   *Paladino*, 89 A.D.2d at 92; *see Gertler*, 107 A.D.2d at 486 (stating that courts should not "sit in review of the day-to-day implementation" of educational policies).

Notwithstanding these concerns regarding the allegations that Fordham provided a "subpar" education, the Court holds that Plaintiff's claims are sufficiently grounded in contract

6

that they are not barred by the educational malpractice doctrine at this stage.   The Court turns, therefore, to the merits of Plaintiff's claims.

## II.      Breach of Contract Claim

Plaintiff alleges that he and Fordham "entered into a contractual relationship where Plaintiff would provide payment in the form of tuition and fees, and [Fordham], in exchange, would provide in-person educational services, experiences, opportunities, and other related services."   (Compl. ¶ 53.)   Plaintiff alleges that Fordham breached this contract "by failing to provide in-person education services for the entirety of the Spring Semester 2020."   (*Id.* ¶ 60.)

The parties disagree as to whether Plaintiff has adequately pleaded the elements necessary to establish a breach of contract claim.   (Mem. at 9; Opp'n at 8.[1])   The Court agrees with Fordham that Plaintiff has failed to plead two essential elements of its contract claim: a sufficiently specific promise to provide in-person educational services, and breach of the contract between Fordham and its students.   Because Plaintiff's contract claim would fail on either of these two grounds, the Court does not reach the parties' arguments regarding damages, acceptance, and impossibility.

## A.   Alleged Promise to Provide In-Person Educational Services

### 1.   Application of Legal Principles to Implied Educational Contracts

In general, in order to state a claim for breach of contract, a plaintiff must allege the existence of an agreement; adequate performance of the contract by the plaintiff; breach of contract by the defendant; and damages.   *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004).

---

[1]  Fordham does not dispute Plaintiff's performance.   *See* Compl. ¶ 59 (alleging that Plaintiff and putative class members "fulfilled their end of the bargain when they paid monies due for Spring 2020 Semester tuition").   Accordingly, only the terms of the alleged contract, breach, and damages are at issue.

In New York, the law recognizes the existence of an implied contract between universities and their students.    *Gally*, 22 F. Supp. 2d 199, 206 (S.D.N.Y. 1998) (Jones, J.). The terms of that contract are contained in the "bulletins, circulars and regulations made available to the student."    *Id.*    Pursuant to this contract, if the student "complies with the terms prescribed by the university, she will obtain the degree she seeks."    *Id*.    Conversely, a student may seek redress for alleged breaches by the university.    *Id.*

The application of contract principles to the relationship between universities and their students, however, does not "provide judicial recourse for every disgruntled student."    *Id.* at 207. In keeping with the restrained approach that courts take with respect to disputes involving educational institutions, "a cause of action for breach of contract . . . requires a contract which provides for 'certain specified services.'"    *Baldridge v. State*, 293 A.D.2d 941, 943 (3d Dep't 2002) (quoting *Paladino*, 89 A.D.2d at 92).    A court's review of contractual claims is thus "circumscribed to enforcing specific promises."    *Ford*, 2020 WL 7389155, at *3; *compare Ansari*, 1997 WL 257473, at *3 (allowing claims to proceed when student identified specific promises by the university to provide "state-of-the-art facilities, faculty tutor-advisors, appropriate recognition upon completion of the program, overviews of the latest techniques, program activities from 9:00 A.M. to 4:00 P.M. every day, and membership in the [American Association of Orthodontics]"), *with Gally*, 22 F. Supp. 2d at 207-08 (dismissing claims in which student identified only "general promises about ethical standards" and an aspirational statement regarding the timeline for releasing final grades) *and Chira v. Columbia Univ. in New York*, 289 F. Supp. 2d 477, 485-86 (S.D.N.Y. 2003) (Baer, J.) (dismissing claims in which student "point[ed] to no document or conversation that gives rise to a promise which Columbia breached").

In addition, a university's "academic and administrative prerogatives" are not "impliedly

limited by custom, or by a strained theory of contractual construction."   *Gertler*, 107 A.D.2d at

485.   An implied promise must be determined "cautiously," not by custom or strained

interpretation, in instances in which a court may "rightfully assume that [the promise] would

have been made if attention had been drawn to it" and in order to "enforce a manifest equity" or

to "reach a result which the unequivocal acts of the parties indicate they intended to effect."   *Id.*

(quoting *Genet v. Delaware & H. Canal Co.*, 136 N.Y. 593, 608 (1893)); *see Gertler*, 107

A.D.2d at 485-86 (dismissing professor's claim regarding the adequacy of research facilities

because the "university has never expressly, by contract or otherwise, obligated itself to provide

the amenities plaintiff claims").

### 2.   Alleged Promise to Provide In-Person Educational Services

The alleged promise in this case is that Fordham would provide "in-person educational

services, experiences, opportunities, and other related services."   (Compl. ¶ 3.)   Fordham

argues, however, that Plaintiff has not adequately identified any specific promise to this effect

and cannot "point to a single statement" in the course catalog or other publications "reflecting

that Fordham promised to provide all of [its] classes exclusively in-person and on campus

throughout the entirety of the semester, and not in any other format regardless of any exigent

circumstances."   (Mem. at 12.[2])

As it must, the Court accepts the factual allegations in the Complaint as true and draws all

reasonable inferences in Plaintiff's favor.   *See Bolt Elec. v. City of N.Y.*, 53 F.3d 465, 469 (2d

---

[2]  Fordham argues also that a written Financial Responsibility Agreement ("FRA") requires Plaintiff to pay
"[a]ny and all costs associated with [his] registration and or receipt of services."   (Mem. at 11; Terzulli Aff. at
Ex. A, ECF No. 17.)   According to Fordham, the FRA nowhere promises that Fordham will provide only
in-person educational services.   The Court need not, however, decide the precise scope or effect of the FRA.
New York law implies a contract between students and universities, and Fordham concedes the existence of a
"contractual arrangement" that includes "the implied agreement."   (Reply at 10; *see Gally*, 22 F. Supp. 2d. at
206.)   Even if Fordham is correct that the FRA does not contain a specific promise to provide in-person
educational services, the FRA does not foreclose the possibility that Fordham elsewhere may have made such a
promise.

9

Cir. 1995).   The Court agrees with Fordham, however, that Plaintiff has not pleaded factual allegations that "raise a right to relief above the speculative level."   *Twombly*, 550 U.S. at 555.

The key publication identified by Plaintiff is a catalog that identifies courses offered, instructors, and the times and locations of classes.   (Compl. ¶¶ 4-5.)   With respect to location, the catalog allowed students to search course offerings, which included information identifying the campus, building, and room where each course was to take place.   (*Id.* ¶ 6.)   The catalog also had a search filter for the "[t]ype" of course, including "[i]n-[p]erson" and "[o]nline" options. (*Id.* ¶ 7.)   Before the semester began, Plaintiff "consulted" the catalog and understood that each course for which he enrolled would be taught in person.   (*Id.* ¶ 19.)   This belief was based on the catalog's identification of an on-campus location for each class, in addition to the fact that other courses were listed as being "[v]irtual (online courses only)."   (*Id.*)

Plaintiff's allegations are based also on Fordham's Academic Policies and Procedures. (*Id.* ¶¶ 8, 57.)   Specifically, Plaintiff cites the statements that students "are expected to attend every class of every course for which they are registered," and that they are "responsible for keeping a record of their own absences and may not exceed the maximum allowed."   (*Id.* ¶ 8.) Plaintiff points further to Fordham's policy not to provide class credit to students transferring from other institutions for "online courses" they may have taken elsewhere.   (*Id.* ¶¶ 9, 58.) Finally, Plaintiff alleges that Fordham markets the "on-campus experience" as a benefit of enrollment.   (*Id.* ¶ 38.)

None of these statements, however, constitutes a specific promise on Fordham's part to provide "certain specified services."   *Baldridge v. State*, 293 A.D.2d 941, 943 (3d Dep't 2002) (quoting *Paladino*, 89 A.D.2d at 92).   The course catalog contains informational guidance regarding, for example, a course's instructor, location, and schedule.   But there are no express statements promising that these aspects of a course were not subject to change.   Nor has

Plaintiff identified any statement in which Fordham "relinquished its authority" to alter the modality of its course instruction.   *Gertler*, 107 A.D.2d at 485; *see also Paynter v. NYU*, 319 N.Y.S.2d 893, 894 (1st Dep't 1971) (reversing tuition refund when classes were suspended due to student demonstrations, because the "circumstances of the [university-student] relationship permit the implication that the professor or the college may make minor changes" to the services rendered by the university).   The allegation that Fordham made a sweeping promise to provide in-person educational services, based on its course descriptions, is not comparably specific to a promise to provide a certain number of instructional hours or facilities of a certain caliber.   *See, e.g.*, *Ansari*, 1997 WL 257473, at *2.

    As for the alleged statements regarding transfer credits, attendance, and marketing, these are "more akin to general statements of policy" than to "specifically designated and discrete promises" regarding "the incidents of the forthcoming education."   *Ward v. New York Univ.*, 2000 WL 1448641, at *4 (S.D.N.Y. Sept. 28, 2000) (Casey, J.).   In addition, the attendance policy makes no distinctions among different modes of instruction, and tracking attendance is not a policy that on its face applies only to an in-person course.   (Mem. at 13; *see Lindner*, 2020 WL 7350212, at *8 ("[R]egular class attendance is possible during both in-person and virtual instruction.").)

    In support of its position, Plaintiff alerted the Court to recent decisions in cases brought against Rensselaer Polytechnic Institute ("RPI") and the Rochester Institute of Technology ("RIT").   (Notice of Supp. Authority, ECF No. 32.)   In both cases, the courts held that the plaintiffs had sufficiently alleged specific promises to provide in-person programs.   *See Ford*, 2020 WL 7389155, at *5-6; *Bergeron*, 2020 WL 7486682, at *7-8.   In the RPI decision, a district court in the Northern District of New York found that RPI's catalog described a program that relied on a "time-based clustering and residential commons program" that could be fairly

characterized as a "mandatory" on-campus program.   *Ford*, 2020 WL 7389155, at *4.   The

court found further that, in its catalog and other publications, RPI made "bold claims" about its

in-person programming and "hammered repeatedly on the benefits of those programs."   *Id.* at

*5.   With respect to the case brought against RIT, the institution offered two different

programs—an "in-person, hands-on program" and "fully online distance learning

programs"—that were mutually exclusive and charged significantly different tuition rates.

*Bergeron*, 2020 WL 7486682, at *1.   Contrasting these programs, a district court in the Western

District of New York identified "a multitude of promises made by RIT with respect to the

benefits of enrollment in the more expensive in-person, on-campus program," as well as specific

statements regarding student fees.   *Id.* at *7-8.

In this case, however, Fordham's alleged statements do not rise to the level of a specific

promise to provide in-person educational services.   The Court finds more persuasive the

analysis in *Linder*.   In that decision, a district court in the Central District of California analyzed

statements similar to those that Plaintiff alleges here, that were contained in Occidental

University's corresponding publications, including a course catalog and attendance policy.   *See*

*Lindner*, 2020 WL 7350212, at *2.   Applying California law, the court held that plaintiffs had

"failed to identify any specific language" in these documents that promised in-person instruction.

*Id.* at *8-9.

In addition to its textual arguments, Plaintiff argues that a "prior course of conduct"

establishes that Fordham promised to provide in-person services, because Plaintiff attended

classes and was able to access campus facilities before the pandemic.   (Opp'n at 14; *see* Compl.

¶ 18 (alleging that Plaintiff is enrolled in a Chemistry program that "relies extensively on

in-person instruction, peer collaboration, and access to laboratory facilities").)

Plaintiff's argument is unavailing.   Breach of contract actions between a student and a

university "must be grounded in a text ..., or else courts should decline to involve themselves." *Ford*, 2020 WL 7389155, at *4.   A promise to provide in-person education, based on the "nature of [Plaintiff's] dealings" with Fordham, is not grounded in a text but rather implied in "custom," specifically the customary in-person nature of Fordham's undergraduate programming. *See Gertler*, 107 A.D.2d at 485.   Such an implied promise "does not withstand scrutiny."   *Ford*, 2020 WL 7389155, at *4.

Moreover, prior conduct in the educational setting does not transform over time into contractual entitlement.   *See Gertler*, 107 A.D.2d at 484-85 (rejecting claim that professor was contractually entitled to certain "perquisites of faculty life").   And even if Fordham and its students were accustomed to in-person instruction, caution is warranted before implying promises in contracts such as that governing Fordham's relationships with its students.   *Id.* at 485.   In these circumstances, the Court cannot "rightfully assume" that Fordham would have made a specific, far-reaching promise to provide in-person educational services had "attention been drawn" to that promise.   *Id.* (quoting *Genet*, 136 N.Y. at 609).

In sum, the Court holds that Plaintiff has failed to plead the first element of its contract claim.   The Complaint has not sufficiently pleaded that the implied contract with Fordham promises "certain specified services," and it does not identify a "specific promise[]" to provide in-person education.   *Baldridge*, 293 A.D.2d at 943 (quoting *Paladino*, 89 A.D.2d at 92); *Ford*, 2020 WL 7389155, at *3.

## B.   Allegations of Breach

In order to plead a viable contract claim, Plaintiff also must allege breach of the implied agreement with Fordham.   The Complaint, however, fails to do so.

The "essence" of an implied contract between university and student is that the university "must act in good faith in its dealings with its students."   *Olsson v. Bd. of Higher Educ.*, 49

13

N.Y.2d 408, 414 (1980).   In order to plead an actionable breach, the student must show that the university "acted in bad faith or in an arbitrary or irrational manner."   *Pell v. Trustees of Columbia Univ.*, 1998 WL 19989, at *20 (S.D.N.Y. Jan. 21, 1998) (Sotomayor, J.) (citation and internal quotation marks omitted); *see also Babiker v. Ross Univ. Sch. of Med.*, 2000 WL 666342, at *6-7 (S.D.N.Y. May 19, 2000) (Katz, J.) (citation omitted).

Plaintiff argues that this deferential standard does not apply, because it is applicable only in "Article 78 proceedings and cases involving the subjective judgment of professional educators." (Opp'n at 15.[3])   Plaintiff argues that, in any case that does not involve the exercise of "specialized discretion," an educational institution "is entitled to no more deference than any other defendant."   (*Id.* at 7, 16; *see Tedeschi v. Wagner Coll.*, 49 N.Y.2d 652, 659 (1980) (stating that, with respect to "academic achievement" as opposed to "nonacademic matters," the contract "tends to be limited" to the "condition of good faith" that is implied in law).)

Courts have not, however, applied deferential standards as narrowly as Plaintiff suggests. As explained in *Baldridge*, a contract pursuant to which a student brings suit must provide for "certain specified services" precisely because courts have "quite properly exercised the utmost restraint applying traditional legal rules to disputes within the academic community."   293 A.D.2d at 943 (quoting *Paladino*, 89 A.D.2d at 92 and *Olsson*, 49 N.Y.2d at 413).   The New York Court of Appeals has "explicitly cautioned" that the legal theories underpinning certain deferential principles in the university context are "not well defined" and that "[c]ontract theory is not wholly satisfactory" in the context of the relationship between a university and its students. *See Maas v. Cornell Univ.*, 94 N.Y.2d 87, 95 (1999) (discussing *Tedeschi*).

---

[3]  "Article 78 proceedings" refer to specific proceedings in which litigants may seek judicial review of agency decisions, pursuant to Article 78 of New York's Civil Practice Law & Rules ("CPLR").   Private universities are "accountable in a CPLR article 78 proceeding, with its well-defined standards of judicial review, for the proper discharge of their self-imposed as well as statutory obligations."   *Gertler*, 107 A.D.2d at 486.

Accordingly, courts have applied deferential principles, including the "bad faith" standard, outside of the Article 78 context and in diverse circumstances.   *See, e.g.*, *Anthes v. N.Y. Univ.*, 2018 WL 1737540, at *13 (S.D.N.Y. Mar. 12, 2018) (Carter, J.) (breach of contract claims for inadequate efforts to assist a student's employment search); *Pearson v. Walden Univ.*, 144 F. Supp. 3d 503, 511 (S.D.N.Y. 2015) (Karas, J.) (breach of contract claims for, among other things, inadequate dissertation supervision); *Babiker v. Ross Univ. Sch. of Med.,* 2000 WL 666342, at *6 (S.D.N.Y. May 19, 2000) (Katz, J.), *aff'd*, 86 F. App'x 457 (2d Cir. 2004) (breach of contract claims for dismissal of student); *see also Pell v. Trustees of Columbia Univ. In City of New York*, 1998 WL 19989, at *20 (S.D.N.Y. Jan. 21, 1998) (Sotomayor, J.) (emphasis added) ("Plaintiff has presented facts, that if proven, may evidence that Columbia acted in 'bad faith or in an arbitrary or irrational manner,' *thus giving rise to a viable breach of contract claim*.").[4]

Plaintiff argues further that deference is unwarranted because Fordham's decision to retain money is akin to a "standard commercial business decision."  (Opp'n at 8.)   This argument is not persuasive.   The Complaint's allegation of breach is based on a failure to provide in-person services because of the COVID-19 pandemic and the related decision to retain tuition and fees.  (Compl. ¶¶ 34, 60-61).   Judicial scrutiny of these actions would require analysis of educators' judgments with respect to what may have been "appropriate and necessary to

---

[4]  Plaintiff identifies certain decisions in which courts have not applied deferential principles.   (Opp'n at 16.)   None of these decisions, however, expressly limits the deferential standard that universities may receive.   In addition, these decisions do not require the courts to "review any educational decisions of the sort which should be left to educators."   *Ansari*, 1997 WL 257473, at *3; *see O'Neill v. New York University*, 97 A.D.3d 199, 213 (1st Dep't 2012) (holding that allegations concerning failure to follow internal policies regarding termination of employment did not implicate "highly specialized" judgments); *Deen v. New Sch. Univ.*, 2007 WL 1032295, at *3, *3 n.5 (S.D.N.Y. Mar. 27, 2007) (Wood, J.) (allowing claim to proceed for one of eight "specified services" that did not raise educational malpractice issues); *Novio v. New York Academy of Art*, 317 F. Supp. 3d 803, 811-14 (S.D.N.Y. 2018) (Sweet, J.) (allowing claims to survive for specific promises, including to respond promptly to sexual harassment complaints and to provide career services).   In this case, in contrast, a university-wide transition to remote instruction reflects educators' judgments as to what may have been "appropriate and necessary to [Fordham's] continued existence."   *Gertler*, 107 A.D.2d at 485.   A deferential standard is thus appropriate.

[Fordham's] continued existence." *Gertler*, 107 A.D.2d at 485.  In these circumstances, it is appropriate for the Court to apply a deferential standard.

The Complaint does not allege that Fordham acted in bad faith when it suspended in-person classes and transitioned to remote learning.   Indeed, the Complaint makes clear that Fordham made this transition "because of" the COVID-19 pandemic.   (Compl. ¶¶ 1, 11, 34.) The transition was made around the time that executive orders issued by Governor Andrew Cuomo required universities to cease in-person classes.   *See* N.Y. Exec. Order No. 202 (Mar. 7, 2020) (declaring state of emergency); N.Y. Exec. Order No. 202.8 (Mar. 20, 2020) (requiring non-essential businesses to reduce in-person workforces by 100%); *see also Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998) (stating that "a district court may rely on matters of public record in deciding a motion to dismiss").

In briefing, Plaintiff argues that Fordham acted arbitrarily because it refunded some mandatory fees and not others, such as tuition.   (Opp'n at 16-17.)   According to Plaintiff in its opposition, "[t]here is no logical explanation for why tuition and some mandatory fees [which were partially refunded] have been treated differently" from each other.   (*Id.* at 17.)   But Plaintiff has not alleged *in the Complaint* any arbitrary actions by Fordham with respect to the retention of fees.   Rather, the Complaint alleges that "payment of tuition and fees were intended to cover in-person education, experiences, and services for the entirety of the Spring Semester 2020."   (Compl. ¶ 10.)   It then states that Fordham announced that it would not refund any *tuition*, but makes no reference to statements or policies with respect to other fees.   (*Id.* ¶ 15.) It is clear, however, that some of those fees were partially refunded, because Plaintiff then claims that the Class is entitled to "a refund of all fees, *not just the few Fordham has reduced*."   (*Id.* ¶ 16 (emphasis added).)   There are no allegations in the Complaint, however, as to the arbitrariness of certain reductions and not others.

In short, Plaintiff has not alleged that Fordham acted in bad faith or arbitrarily with respect to retaining either tuition or any other fees.[5]  Indeed, Plaintiff has not even identified the specific non-tuition fees to which the putative class may be entitled, nor alleged any statements by Fordham reflecting promises to provide services in connection with those fees.

In light of the above, the Court holds that Plaintiff has failed to plead the breach element of its contract claim.   The Complaint fails to allege that Fordham acted in "bad faith or in an arbitrary or irrational manner" when it transitioned to remote learning because of the COVID-19 pandemic and when it retained tuition and other fees in spite of that transition.   *Pell*, 1998 WL 19989, at *20 (citation omitted).

## C.   Damages, Acceptance, and Impossibility

At the pleading stage, plaintiffs may allege damages in a "plain and simple fashion." *Lan Sang v. Ming Hai*, 951 F. Supp. 2d 504, 527 (S.D.N.Y. 2013) (Oetken, J.).   Damages may not be merely speculative or imaginary, but must be reasonably certain and traceable to the alleged breach of contract.   *Getko Grp., Inc. v. Amica Mut. Ins. Co.*, 2003 WL 22455303, *2 (S.D.N.Y. Oct. 28, 2003) (Marrero, J.).

Plaintiff alleges payment of a certain sum in tuition and fees and claims a refund in connection with the failure to provide in-person educational services.   (Compl. ¶ 4; Opp'n at 17.)   Fordham responds that Plaintiff has made an insufficient, "nebulous" damages claim that the classes received were "subpar" as compared to in-person instruction.   (Mot. at 16.) Fordham argues further that this claim for damages "reinforce[s] the notion that Plaintiff's claims are essentially an educational malpractice claim."   (*Id.* at 17.)

---

[5]  The lack of specificity on this issue stands in contrast with allegations in cases in which the portion of the Complaint relating to fees survived a motion to dismiss.   *See, e.g.*, *Bergeron*, 2020 WL 7486682, at *2 (detailing allegations regarding student activity and health services fees, including the allegation that the institution offered no refunds for those fees).

The Court has already described the serious damages issues that may arise in light of New York law and public policy regarding educational malpractice.   The Court need not, however, reach the question whether Plaintiff has sufficiently pleaded damages, because Plaintiff has failed to plead both the existence of a specific contractual promise to provide in-person educational services and that Fordham breached such a promise.

For similar reasons, the Court need not reach the parties' arguments regarding the doctrines of acceptance and impossibility of performance.   (*See* Mem. at 18-19, Opp'n at 18-20.)

## III.   Quasi-Contractual Claims

In addition to the breach of contract claim, Plaintiff seeks relief based on three quasi-contractual claims: unjust enrichment, conversion, and money had and received.   (Compl. ¶¶ 66-88.)

Fordham argues that all three of these claims must be dismissed because they are "duplicative" of the contract claim.   (*See* Mem. at 20, 23, 24; *Corsello v Verizon N.Y., Inc.*, 18 N.Y.3d 777, 791 (2012) ("An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim.").)   Plaintiff responds that these claims may proceed in the alternative.   (Opp'n at 21-22, 24-25.)

As explained below, the Court holds that Plaintiff has not sufficiently pleaded claims for unjust enrichment, conversion, and money had and received.   Accordingly, the Court need not decide whether these claims must be dismissed on the separate ground that they are duplicative of Plaintiff's breach of contract claim.

## A.   Unjust Enrichment

To establish a claim for unjust enrichment, a plaintiff must establish that the defendant was enriched, at plaintiff's expense, and equity and good conscience counsel against defendant's retention of what plaintiff seeks to recover.   *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373

F.3d 296, 306 (2d Cir. 2004) (citing *Clark v. Daby*, 751 N.Y.S.2d 622, 623 (3d Dep't 2002)).
The mere fact that a benefit is bestowed on a defendant is insufficient.   *Clark*, 751 N.Y.S.2d at
623.   When assessing considerations of equity and justice, courts generally consider, among
other things, "whether the defendant's conduct was tortious or fraudulent."   *Id.* at 624 (citing
*Paramount Film Distrib. Corp. v. State*, 285 N.E.2d 695, 698 (N.Y. 1972)).

Plaintiff alleges that Fordham "voluntarily accepted and retained" the benefit of tuition
and fee payments, "even though [Fordham] has failed to provide the education, experience, and
services for which the tuition and fees were collected, making [Fordham's] retention unjust under
the circumstances."   (Compl. ¶¶ 69-70.)   Plaintiff alleges also that "[o]n March 9, 2020,
Fordham announced that because of the global COVID-19 pandemic, all in-person classes would
be suspended effective that same day."   (*Id.* ¶ 34.)   "Online classes" began two days later, on
March 11.   (*Id.*)

Plaintiff argues that it is inequitable for Fordham to retain money paid "for an in-person
education, experience, and services" and for students "to pay for 100% of the products, programs,
access, and services that were never provided."   (Opp'n at 23-24.)   Fordham argues that
Plaintiff has not alleged any conduct that is tortious or fraudulent.   (Mot. at 22.)   Rather, the
university transitioned to remote instruction because of the pandemic and quickly implemented a
plan to allow students to complete their courses.   (*Id.*)   In addition, Fordham reiterates that
courts should not adjudicate claims that "virtual learning was somehow inferior to in-person
classes."   (*Id.*)

The Court agrees with Fordham that there are no facts alleged regarding tortious or
fraudulent conduct.   Indeed, the concession that Fordham commenced online classes within two
days shows that Fordham acted promptly in the face of the pandemic in order to continue
educating its students.   (Compl. ¶ 34.)

In addition, for the same reasons discussed with respect to the breach of contract claim, Plaintiff has not identified sufficiently specific statements in connection with in-person educational services, such that the cessation of those services would lead to inequity.   *Cf. Ford*, 2020 WL 7389155, at *9 (holding that "alleged suggestions of the value of [the institution's] in-person programming" made a claim of inequity plausible).

In these circumstances, the Court holds that Plaintiff has not sufficiently pleaded that "equity and good conscience require restitution."   *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000).   As a result, Plaintiff's unjust enrichment claim must be dismissed.

## B.   Conversion

To establish a claim for conversion, a plaintiff must show "legal ownership or an immediate superior right of possession to a specific identifiable thing and must show that the defendant exercised an unauthorized dominion over the thing in question to the exclusion of the plaintiff's rights."   *Barnet v. Drawbridge Special Opportunities Fund LP*, 2014 WL 4393320, at *19 (S.D.N.Y. Sept. 5, 2014) (Castel, J.) (quoting *Nat'l Ctr. for Crisis Mgmt., Inc. v. Lerner*, 938 N.Y.S.2d 138-39 (2d Dep't 2012)).

The conversion of "intangible property" is not actionable.   *Sun Gold, Corp. v. Stillman*, 946 N.Y.S.2d 24, 25 (1st Dep't 2012).   Nor may a conversion claim seek to enforce "a mere obligation to pay money."   *Ehrlich v. Howe*, 848 F. Supp. 482, 492 (S.D.N.Y. 1994) (Sweet, J.). In such cases, it must be alleged that "the money converted was in specific tangible funds of which claimant was the owner and entitled to immediate possession."   *Id.*

Fordham argues that "in-person educational services" do not constitute tangible property that can support a conversion claim.   (Mot. at 24.)   Plaintiff responds that a "specific, identifiable" fund exists because Plaintiff's tuition and fees were entrusted to Fordham for the particular purpose of providing in-person educational services to which Plaintiff had "identifiable

legal rights" when the money was paid.    (Opp'n at 24; Compl. ¶ 75.)    Fordham argues in turn that it is impossible to distinguish between tuition funds that covered in-person instruction during the first part of the Spring 2020 semester and those that covered the remote instruction after the onset of the pandemic.    (Reply at 11.)

The Court agrees with Fordham.    The sole decision cited by Plaintiff involves whether a company improperly withheld a specific sum of money that an employee had received as a bonus. *Thys v. Fortis Sec. LLC*, 903 N.Y.S.2d 368, 368 (1st Dep't 2010).    The employee then returned that money, subject to a specific agreement that the funds would be entrusted to the company for the purpose of recalculating and repaying the bonus in a different currency.    *Id.* at 368.    Unlike in *Thys*, however, Plaintiff cannot identify a comparably "specific, identifiable" fund and "cannot realistically argue that once that money was paid to defendant it remained intact, as opposed to pooling in with defendant's other funding."    *Ford*, 2020 WL 7389155, at *9.

Accordingly, Plaintiff has not sufficiently pleaded the elements of conversion, and this claim must be dismissed.

## C.    **Money Had and Received**

To establish a claim for money had and received, a plaintiff must show that "(1) defendant received money belonging to plaintiff; (2) defendant benefitted from receipt of money; and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money."    *Moreno-Godoy v. Gallet Dreyer & Berkey, LLP*, 2016 WL 5817063, at *4 (S.D.N.Y. Oct. 4, 2016) (Francis, J.).    Traditionally, a remedy is available if money is "obtained from another, through the medium of oppression, imposition, extortion, or deceit, or by the commission of a trespass."    *Panix Promotions, Ltd. v. Lewis*, 2002 WL 122302, at *2 (S.D.N.Y. Jan. 22, 2002) (Baer, J.) (quoting *Miller v. Schloss*, 113 N.E. 337, 339 (N.Y. 1916)).

Plaintiff has not alleged any facts that would support a finding of "oppression, imposition,

extortion, or deceit." *Panix Promotions,* 2002 WL 122302, at *2.   Plaintiff argues instead that whether the "original possession of the money by the defendant was rightful or wrongful" is "immaterial."   (Opp'n at 25; *see Marini v. Adamo*, 995 F. Supp. 2d 155, 206 (E.D.N.Y. 2014) (quoting *Roberts v. Ely*, 20 N.E. 606, 608 (N.Y. 1889)).)   Plaintiff thus argues that, for the same reasons that it has demonstrated Fordham's unjust enrichment, it has satisfied the elements of the money had and received claim.   (Opp'n at 25; *Marini*, 995 F. Supp. 2d at 206.)

Several courts, however, have held that plaintiffs "lack the requisite possessory interest in money" when it is "freely given to a defendant with the expectation of performance."   *Fernbach, LLC v. Capital & Guarantee Inc.*, 2009 WL 2474691, at *5 (S.D.N.Y. Aug. 12, 2009) (Stein, J.) (citing *Panix Promotions*, 2002 WL 122302, at *2); *Nat'l Westminster Bank PLC v. Grant Prideco, Inc.*, 261 F. Supp .2d 265, 275 n.69 (S.D.N.Y. 2003) (Kaplan, J.).

In this case, Plaintiff alleges that money is owed because Fordham failed to perform. (*See* Compl. ¶ 84 ("[Fordham] has retained the monies paid by Plaintiff ... while not providing in-person educational services, activities, opportunities, resources, and facilities for which those monies were paid.").)   Because Plaintiff freely paid tuition to Fordham, with the "expectation of performance, not repayment," the claim for money had and received must fail.   *Panix Promotions*, 2002 WL 122302, at *2.

In addition, for the same reasons that the unjust enrichment claim fails—because "equity and good conscience" do not demand restitution in these circumstances—the money had and received claim fails as well.   *See Fischer v. Graham*, 2016 WL 3181157, at *4, *4 n.3 (S.D.N.Y. June 3, 2016) (Román, J.) (quoting *Belda v. Doerfler*, 2015 WL 5737320, at *4, n.4 (S.D.N.Y. Sept. 30, 2015) (Nathan, J.)) ("The cause of action for money had and received is 'essentially identical to a claim of unjust enrichment.'").

Accordingly, Plaintiff has not sufficiently pleaded the elements of money had and

received, and this claim must be dismissed.

## IV.    Leave to Amend

Courts "should freely give leave when justice so requires."   Fed. R. Civ. P. 15(a)(2). "However, where the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal, opportunity to replead is rightfully denied." *Hayden v. Cty. of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999).

Plaintiff filed the initial complaint on April 25, 2020.   (ECF No. 1.)   On July 17, in accordance with the Individual Rules of Practice of Judge Swain (to whom this case was originally assigned), Fordham sent a letter to Plaintiff "outlining the bases for a motion to dismiss" that Fordham intended to file.   (Mem. at 5.)   Plaintiff filed the First Amended Complaint, and Fordham moved to dismiss.   (ECF Nos. 12, 15.)   Plaintiff opposed the motion, without further amendment, and has not sought leave to amend.   (ECF No. 21.)

If Plaintiff seeks leave to amend the First Amended Complaint, Plaintiff must file a letter motion explaining how a second amended complaint would state a claim that is consistent with this Opinion and Order.   Plaintiff shall append to the letter a draft of the proposed second amended complaint, red-lined to show the changes from the First Amended Complaint.   The letter motion must be filed on or before February 11, 2021.

**CONCLUSION**

For the foregoing reasons, Fordham's motion to dismiss for failure to state a claim is GRANTED.

Plaintiff may seek leave to amend by filing a letter motion on or before February 11, 2021. Should Plaintiff fail to do so, the Court will dismiss the First Amended Complaint with prejudice and direct the Clerk of Court to close this case.

The Clerk of Court is respectfully directed to terminate the motion at ECF No. 15.

SO ORDERED.

Dated: New York, New York
January 28, 2021

_/s/ Kimba M. Wood_
KIMBA M. WOOD
United States District Judge